**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                                           16-34-SDD-RLB

DARRYL L. WILLIAMS

<u>**RULING**</u>

This matter is before the Court on the *Motion to Suppress*[1] filed by the Defendant, Darryl L. Williams ("Defendant"). The United States ("the Government") has filed an *Opposition*[2] to this motion. The Court held an evidentiary hearing on this motion on February 16, 2017, took the matter under advisement, and allowed the Parties to file post-hearing briefs.[3] The Court has considered the arguments of the Parties, the testimony and evidence presented at the hearing, and the law as applied to the facts of this case. For the reasons set forth below, the Defendant's motion shall be denied.

**I.     FACTUAL BACKGROUND**[4]

On February 27, 2014, Baton Rouge Police Department ("BRPD") officers Chris McClure and Corporal David Burtwell responded to a report of an unresponsive female at 1855 Birch Street in Baton Rouge. When officers arrived, they discovered that the female was deceased. Defendant was present at the scene,[5] having stayed overnight

---

[1] Rec. Doc. No. 19.
[2] Rec. Doc. No. 22.
[3] *See* Rec. Doc. Nos. 24, 29 & 30.
[4] The factual background was derived from the Parties' briefs and testimony presented at the hearing.
[5] The residence is owned by Alexis Evans, a friend of the Defendant's, and Defendant testified that he was temporarily residing therein. Transcript, p. 65.
39089

with the female and woken to find her unresponsive.  While attending to the female, officers noticed what appeared to be narcotics and drug paraphernalia in plain sight.

The Defendant was removed from the house, handcuffed, and questioned regarding the deceased female and the apparent drugs.  Officers sought the Defendant's consent to search the residence, and he agreed with certain conditions:  that the officers loosen his handcuffs, allow the Defendant to accompany the officers in the search, and limit the search to the bedroom where the deceased was found.  Defendant contends he noted these conditions on the consent to search form that he signed.

The Defendant argues that his consent was not given voluntarily under the circumstances, that the conditions of his alleged consent were ignored, and that the search continued after his alleged consent was withdrawn.  As such, Defendant contends that the firearm found in the bedroom should be suppressed.

The Government maintains that the officers had valid, voluntary consent from the Defendant to search the premises; that the firearm was found in the bedroom for which Defendant specifically consented; and that the firearm would have ultimately been found under the inevitable discovery doctrine.    The Government further contends that all conditions placed on the consent to search were upheld, and at no time did the Defendant withdraw his consent to the search.

## II.    LAW & ANALYSIS

### A.  Motion to Suppress

Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence**,** that the evidence obtained was in violation of his Fourth

39089

Amendment rights.[6]  Conversely, at a suppression hearing, the Government must prove, by a preponderance of the evidence, that the challenged evidence was lawfully obtained.[7]

### B. Voluntariness of Consent

"Consensual searches ... serve as an exception to the warrant requirement so long as the consent is free and voluntary."[8]  "The government's ability to rely upon the consent exception depends on two factors.  First, the government must show that the consent was given voluntarily ... Second, the prosecution must show that either the defendant himself consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent."[9]  Consent-to-search voluntariness is determined by a six-factor, totality-of-the-circumstances analysis. The factors are:  (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[10]  "No one of the six factors is dispositive or controlling of the voluntariness issue."[11]  The Government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given.[12]

---

[6] *United States v. Kelley,* 981 F.2d 1464, 1467 (5th Cir.1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir.1992)).

[7] *United States v. Valenzuela*, 716 F.Supp.2d 494, 500 (S.D. Tex. 2007) (citing *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974)).

[8] *U.S. v. Fernandes*, 285 Fed. Appx. 119, 126 (5th Cir. 2008) (citing *U.S. v. Mata*, 517 F.3d 279, 290 (5th Cir. 2008)).

[9] *U.S. v. Jenkins*, 46 F.3d 447, 451 (5th Cir.1995) (citing *Bumper v. North Carolina*, 391 U.S. 543 (1968); *U.S. v. Matlock*, 415 U.S. 164 (1974)); *see Morales v. Boyd*, 304 Fed. Appx. 315, 318–19 (5th Cir. 2008) (citing *Jenkins).*

[10] *Fernandes*, 285 Fed. Appx. at 126 (citing *Mata*, 517 F.3d at 290).

[11] *U.S. v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

[12] *Id.*

39089

1. <u>Voluntariness of Custodial Status</u>

Defendant contends that his custodial status was clearly involuntary at the time he purportedly consented to the search because, when law enforcement approached him to seek consent, he had been sitting, handcuffed, in the back of a police car for half an hour or forty-five minutes.[13]  Defendant contends that no reasonable person would have felt free to terminate the encounter under these circumstances.  The Government does not dispute that Defendant had been handcuffed and detained at the time his consent was sought by law enforcement.  Thus, this factor weighs in favor of the Defendant.

2. <u>The Presence of Coercive Police Procedures</u>

Defendant claims that, although no explicit threats were made or weapons drawn, "the overwhelming police presence" at the scene created an "implicitly hostile environment."[14]  Defendant contends that the high volume of officers at the scene "created a high pressure situation that undermined his ability to freely exercise his own will."[15]  As the Government notes, there was no testimony that the Defendant felt pressured to consent to the search.  Moreover, Defendant has presented no jurisprudence that a heavy police presence constitutes coercive police procedures.  It was made clear that officers responded to the residence in question both regarding the death of the Defendant's friend and the narcotics found at the scene; thus, both a Homicide team and a Narcotics team were present along with emergency responders.

In *United States v. Solis*, the defendant argued that seven police officers present constituted a show of force that vitiated his consent, and the Fifth Circuit rejected this

---

[13] Transcript, p. 57.
[14] Rec. Doc. No. 29, p. 3.
[15] *Id.*
39089

contention holding: "we have held consent to be voluntary even in the face of greater shows of force than the presence here of seven officers, some in uniform and none with weapons drawn or displaying force beyond their presence in numbers."[16] The Court finds that this factor weighs in favor of the Government.

3. <u>Extent and Level of Defendant's Cooperation</u>

While Defendant concedes that this factor "appears to weigh in favor of the Government," he makes the incongruous argument that this factor is actually "ambiguous at best."[17] Defendant contends that his cooperation was as a result of his emotional distress over the death of his friend and his state of shock at the events. Defendant suggests that his cooperation would have been different if the request to search had been made at a time when he was "not overwhelmed with grief."[18]

The Government points to Defendant's own testimony to undermine this argument:

Q:      Okay. Alright.  And lastly, you said that you were pretty emotional when all this happened, because your friend had passed away; is that right?
A:      Yes.
Q:      But, I mean, but you still had a pretty good idea of what was going on?
A:      Yes, Yes, I mean, yes.  I mean, I realized the severity of the entire situation, so irregardless of how emotional I am, I know that from the stuff that they were saying when they entered that house that, if I make the wrong decision I'd be spending the rest of my life in jail.  So regardless of my emotional state, I, I try my best not to allow my emotions to allow me to make any mistakes that would get me, you know, messed up, because the minute, the minute, that the officers started arriving they were saying she died from a heroin overdose.[19]

Additionally, when asked if he gave some thought to it before he filled out the

---

[16] 299 F.3d 420, 438 (5th Cir. 2002).
[17] Rec. Doc. No. 29, p. 3.
[18] *Id.* at p. 4.
[19] Transcript, p. 85, lines 12-25 through p. 86, lines 1-2.
39089

consent form, the Defendant testified: "Yes, I really did."[20]  Corporal David Burtwell, who obtained the Defendant's consent to search, testified repeatedly that the Defendant was cooperative with the officers' investigation.[21]   There is no question that this factor weighs in favor of the Government.

4.  <u>Defendant's Awareness of His Right to Refuse Consent</u>

Defendant contends that, although he was advised that he could refuse, the fact that officers told him they would get a warrant if he refused to consent renders his consent involuntary.   Defendant claims this assertion that the officers would get a warrant to search anyway "mitigates the value of the purported right to refuse."[22]

This argument is without merit for several reasons.  First, the consent form signed by the Defendant with his own hand-written alterations specifies that he has the right to refuse to consent.[23]  Second, Defendant's own testimony on this issue again undermines his argument.  Defendant testified that he agreed to the search but included items in parenthesis "because I wanted to be sure that they understood exactly what I was agreeing to and giving them permission to do."[24]  When asked at the hearing, "And you knew that you could call it off?", the Defendant responded "Yes."[25]  Officer Chris McClure testified that, upon presenting Defendant with the consent to search form, "We go through the entire step-by-step reading it to them and make sure that they understand what they're signing."[26]  Corporal Burtwell also confirmed the Defendant's understanding of the

---

[20] *Id.*, p. 75, lines 4-6.
[21] Transcript, p. 44, line 6; p. 46, line 2; p.47, line 25 through p. 48, line 1.
[22] Rec. Doc. No. 29, p. 4.
[23] *See* Hearing Exhibit 8.
[24] Transcript, p. 58, lines 2-9.
[25] *Id.* p. 75, lines 10-11.
[26] *Id.*, p. 28, lines 18-20.
39089

consent to search form: "They have a chance to read it, you know, take their time, and before they sign it they're supposed to understand it fully."[27] Corporal Burtwell testified that he reads the consent form and explains it to someone before having them sign and stated that he "let them know, you know, this is their consent and that they can stop it, you know."[28] The Court also finds that Defendant's handwritten notes limiting the scope of the search indicate that he understood his right to refuse consent. This is further supported by the fact that the Defendant later claims that he withdrew his consent.[29]

Finally, the Fifth Circuit has rejected the argument that an officer's statement that he/she will attempt to obtain a warrant vitiates consent. In *United States v. Williams*, the defendant claimed that his consent was mere acquiescence based on the officer's statement that he would get a search warrant which signaled to the defendant that the search was inevitable despite the defendant's wishes.[30] Upholding the district court's denial of the motion to suppress, the Fifth Circuit stated:

> At the point in which the officers asked Williams for his consent to search his backpack, it is clear that the officers had probable cause to conduct such a search, implicating an altogether different standard under the Fourth Amendment. Williams's consent, although given after he was made aware that the officers had probable cause to seek a search warrant, was nevertheless voluntary.[31]

---

[27] *Id.*, p. 46, lines 7-9.

[28] *Id.*, lines 10-17.

[29] *Id.*, p. 61, lines 6-10.

[30] 365 F.3d 399 (5th Cir. 2004).

[31] *Id.* at 406. *See also United States v. Tompkins*, 130 F.3d 117 (5th Cir. 1997)(advising defendant his hotel room would be secured and the officer would obtain a search warrant for the room when informing defendant of the consequences of his refusal to consent, did not render consent involuntary); *United States v. Hernandez*, 1994 WL 789371, at *1 (S.D. Tex. May 13, 1994)("Defendant's primary argument appears to be that his consent was not voluntary because Officer Cavazos told him that if he did not consent, the agents would get a search warrant. Defendant argues that Cavazos should only have said that, absent consent, the agents would attempt to get a search warrant. Hernandez claims that his position is supported by *United States v. Kaplan*, 895 F.2d 618 (9th Cir.1990). Even assuming that Cavazos said the agents "would" get a warrant, Kaplan does not support Defendant's position. On the contrary, Kaplan affirmed a finding of voluntariness when the police told the defendant that "he could either give his permission to search the desk, or he would have to wait to get a search warrant." 895 F.2d at 622. The holding in *Kaplan*

39089

This is the same posture the Defendant was in at the time he was presented the consent to search form. Considering that both a homicide investigation and a narcotics investigation were taking place, and the drugs and drug paraphernalia found in plain view in the room of the deceased, [32] the officers had probable cause to search the bedroom with or without Defendant's consent. Such a statement under the circumstances is a simple fact, not a coercive inducement that vitiated the Defendant's consent. Corporal Burtwell testified that he explained to the Defendant that "there's enough evidence that either we can acquire a search warrant, or he can cooperate and we can do, like, a consent to search."[33] This factor weighs in favor of the Government.

5. Defendant's Education and Intelligence

Defendant contends that this factor is neutral as he has no advanced education or skills, but he admits that he has no documented impairments that would reduce his comprehension of the situation. The Government argues that this factor weighs in favor of finding consent in that the Defendant was "sophisticated" enough to know that he could limit the scope of the search.[34] The Defendant also referenced his "past experience" with law enforcement as a reason he wanted to accompany the officers in the search: "And then also I asked them that they allow me to supervise the search, because, I mean, there's been my experience in the past, like, I feel like that's important."[35] Further, the Defendant testified about his handwritten instructions: "I wanted to be sure that they

_____

is that, "consent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue." *Id.*).

[32] Transcript, p. 42, line 23.

[33] *Id.*, p. 44, lines 2-4.

[34] *Id.*, p. 75; Rec. Doc. No. 30, p. 3.

[35] *Id.*, p. 58, lines 20-22.

39089

understood exactly what I was agreeing to and giving them permission to do."[36]   The Defendant also answered in the affirmative when asked if he gave some thought to it before he filled out the consent form:  "Yes, I really did."[37]   These statements are not indicative of someone lacking the intelligence or education to understand his rights or passively acquiescing to the consent form.  This factor weighs in favor of the Government.

6. Belief That No Incriminating Evidence Would Be Found

The Defendant concedes that this factor weighs in favor of the Government.  The Defendant admitted that he didn't believe anything incriminating would be found in the bedroom, that he "could have quite easily removed" anything before it was found, and that he did not know the gun was located in a bag in the drawer of the dresser.[38]   This factor weighs in favor of the Government.

Accordingly, considering that the only factor that weighs against voluntariness is the Defendant's custodial status, the Court finds that all other factors weigh in favor of a finding of voluntary consent.

## C. Scope of Consent

Having found that Defendant gave voluntary consent to search, the Court turns to Defendant's argument that law enforcement exceeded the scope of the search to which he consented.  "A warrantless entry into the home is presumptively unreasonable under the Fourth Amendment unless it is conducted pursuant to a valid consent."[39]   "Consent

---

[36] *Id.*, p. 58, lines 7-9.
[37] *Id.*, p. 75, lines 4-6.
[38] *Id.*, p. 88, lines 9-23.
[39] *Owens v. Town of Delhi*, 469 F.Supp.2d 403, 406 (W.D.La.2007); see, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)(citing *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *See also U.S. v. Jenkins*, 46 F.3d 447, 451 (5th Cir.1995)).
39089

may be express or implied by the circumstances surrounding the search or by a person's failure to object to the search."[40]  The burden rests with the government to prove by a preponderance of the evidence "that consent was knowing and voluntary, given by a person with authority to give consent, and that the officer did not exceed the scope of consent at any point during the search."[41]

"When the police are relying upon consent ... they have no more authority than they have apparently been given by the consent."[42]  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[43]  Courts must "take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope ... ."[44] Courts have consistently cited a failure to object as "an indication that the search [or entry] was within the scope of the initial consent."[45]  Other factors may outweigh the lack of protest, such as the officers' failure to seek additional consent when appropriate,[46] or an occupant's lack of comfort in objecting.[47]

The testimony at the suppression hearing and the handwritten notes made on the consent to search form establish that Defendant sought to limit the scope of the search.

---

[40] *Owens*, 469 F.Supp.2d at 406; *see, Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).
[41] *Owens*, 469 F.Supp.2d 403, 406 (W.D.La.2007); *see also, U.S. v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997).
[42] *United States v. Fields*, 131 Fed. Appx. 42, 44 (5th Cir. 2005)(citing *United States v. Mendoza-Gonzales*, 318F.3d 663, 667 (5th Cir. 2003)).
[43] *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).
[44] *Fields*, 131 Fed. App'x at 44.
[45] *See e.g. United States v. McSween*, 53 F.3d 684, 688 (5th Cir.1995); *United States v. Mejia*, 953 F.2d 461, 466 (9th Cir.1991), *as amended*, Mar. 25, 1992.
[46] S*ee United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.1996).
[47] *See Mejia*, 953 F.2d at 466.

39089

First, the Defendant's consent was predicated on a request that the officers loosen his handcuffs.  The Defendant testified that the officer complied with this request.[48]  Second, Defendant wrote "bedroom" on the form, indicating that he was only giving consent to search the bedroom where his friend was found dead.  Third, Defendant sought to accompany the officers on the search, although by Defendant's own admission, this notation was undecipherable on the form.[49]

The Defendant claims that he was not allowed to accompany the officers in the search and, when he allegedly observed an officer remove a TV from the wall of the main room of the house, he claims he stated:  "I want to withdraw my consent.  I want to stop this right now, because this ain't right.  Y'all suppose to let me supervise the search."[50]  The Defendant could not recall to whom he made this statement.[51]  The Defendant contends that the officers "just walked me up on the porch, directly to the doorway, and we did a complete spin and just turned right back around and walked directly back to the car."[52]  Defendant testified that he believed the officers did this so they could later say that they walked him into the house.[53]

The testimony of the investigating officers contradicts Defendant's testimony that they searched beyond the bedroom, that Defendant was not allowed to accompany the officers, and that the Defendant withdrew his consent to search.  Officer McClure testified that he recalled the Defendant being present during the entire search and that the search

---

[48] Transcript, p. 58, lines 18-19.
[49] *See* Transcript, p. 74, lines 11-25 ("I'm not sure now when I look at it, but I, me guessing, I would say that it was my attempt to try to tell them, to try to put it writing that I want to supervise the search."  The Defendant stated that the notation read either "my presence," "my promise," or "supervise.").
[50] Transcript, p. 79, lines 22-24.
[51] *Id.*, at p. 64, lines 6-10.
[52] *Id.*, at p. 60, lines 17-19.
[53] *Id.*, lines 22-23.

39089

was limited to the bedroom.[54]   When questioned why he allowed the Defendant to be

present during the search, Officer McClure testified:  "For one he's part of our investigation

now, and two, he has the right to refuse the search at any time.  So it states that on the

form.  So if he's in the back of a police car it would be difficult for him to do that."[55]  Officer

McClure testified that he had no recollection of the Defendant ever informing him that he

wished to withdraw his consent.[56]   Officer Burtwell also testified that the search was

limited to the bedroom and in the Defendant's presence:  "We brought him inside, he

signed the consent and read it.  And the only stipulation he has was to only search the

bedroom … which is his right."[57]  Corporal Burtwell further testified:

> Q:      And if he says only search the bedroom?
> A:      We can only search it anyway, yeah.
> Q:      Okay.  Now, you mentioned that after you got the form done you went
> inside to start the search?
> A:      Yes.
> Q:      And was anybody with you when you did that?
> A:      Me, Detective McClure, and Mr. Williams.
> Q:      Okay.  So you brought Mr. Williams into the house with you when
> you did the search?
> A:      Yes, sir.
> Q:      Okay.  Is that standard?
> A:      Absolutely, yes.
> Q:      And why is that?
> A:      Because they can stop the search at any time.[58]

Upon cross-examination, Corporal Burtwell maintained that the Defendant was in

the bedroom the entire time that he and Officer McClure conducted the search:  "He [the

---

[54] *Id.*, at p. 29, lines 17-23; p. 36, lines 15-22.
[55] *Id.* at p. 29, line 25 through p. 30, lines 1-3.
[56] *Id.*, at p. 37, lines 2-7.
[57] *Id.*, at p. 44, 16-20.
[58] *Id.*, at p. 48, lines 6-19.
39089

Defendant] would have been present to where he could see what we were doing."[59] Corporal Burtwell also testified that he did not recall any time that Defendant withdrew his consent."[60] Corporal Burtwell further testified that, if the Defendant had withdrawn his consent, he would have stopped the search and obtained a search warrant before proceeding.[61]

Officer McClure testified that, during the search of the bedroom, they discovered a scale with residue on top of the dresser, a "kind of a baseball size bag of powder," and a plastic bag with the firearm inside it.[62] Officer McClure testified that they also found mail addressed to the Defendant[63] and a prescription bottle in the Defendant's name in the bedroom.[64] Corporal Burtwell's testimony was consistent, as he testified that the search revealed a digital scale on the dresser with heavy residue, a lot of "baggies" (not found on the dresser), and a firearm packaged in plastic bag in the dresser drawer.[65] Defendant does not dispute that the firearm was located in the bedroom, the only room he admittedly gave consent to search.

Whether the officers in this case exceeded the scope of the consent to search given by this Defendant comes down to a credibility determination. "The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts. At a suppression hearing, it is 'well within the trial court's discretion' to weigh the evidence and

---

[59] *Id.*, at p. 54, lines 2-3.
[60] *Id.*, at lines 11-16.
[61] *Id.*, at p. 55, lines 20-25.
[62] *Id.*, at p. 30, lines 16-19.
[63] *Id.*, at p. 31, lines 4-5.
[64] *Id.*, at p. 37, lines 18-20.
[65] *Id.*, at pp. 48-49.

39089

make credibility determinations regarding conflicting testimony."[66]   The Court has considered all of the testimony, evidence, and arguments by counsel submitted on this motion, and the Court carefully observed the demeanor of the witnesses who testified at the hearing.  To the extent that Defendant's testimony contradicts that of the officers, the Court credits the testimony of Officer McClure, who has been with the BRPD for 17 years, and Corporal Burtwell, also with the BRPD for nearly 8 years.  The Court finds that the officers' testimony was consistent and more credible than Defendant's.  The Court finds by a preponderance of the evidence that Defendant's consent to the search was not withdrawn, and the search did not exceed the scope of the Defendant's consent, *i.e.*, the bedroom.[67]

## III.   CONCLUSION

For the reasons set forth above, the Defendant's *Motion to Suppress*[68] is DENIED. This matter will be set for trial by separate notice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on May 24, 2017.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[66] *United States v. Jones*, 187 F.Supp.3d 714, 723 (M.D. La. 2016) (citing *Norman v. Stephens*, No. H–13–0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013)).
[67] The Court notes in the alternative that, considering the circumstances of a death that was initially being investigated as a homicide, law enforcement would have inevitably discovered the firearm through other lawful means.
[68] Rec. Doc. No. 19.
39089